AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Missouri

| | |
|---|---|
| **In the Matter of the Search of** ) | |
| information associated with the cellular telephone assigned ) | Case No. 4:25 MJ 6050 PLC |
| call number (872) 222-3170 ("the Account"), that are stored ) | *Signed and Submitted to the Court for* |
| at premises controlled by Verizon Wireless ("the ) | *filing by reliable electronic means* |
| Provider"), headquartered at 180 Washington Valley Road, ) | |
| Bedminster, New Jersey 07921 ) | **FILED UNDER SEAL** |

## APPLICATION FOR A SEARCH WARRANT

I, <u>Joshua C. Morrill</u>, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

### See Attachment A

located in the _____ District of <u>New Jersey</u>, there is now concealed

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

✓ evidence of a crime;
contraband, fruits of crime, or other items illegally possessed;
property designed for use, intended for use, or used in committing a crime;
a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, U.S.C., § 1343 | wire fraud |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

✓ Continued on the attached sheet.
❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the forgoing is true and correct

JOSHUA MORRILL
Digitally signed by JOSHUA MORRILL
Date: 2025.03.12 10:27:10 -05'00'

Joshua C. Morrill Special Agent FBI

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41

Date: _____ March 12, 2025 _____

*Patricia L. Cohen*
*Judge's signature*

City and State: St. Louis, MO

Honorable Patricia L. Cohen, U.S. Magistrate Judge
*Printed name and title*
AUSA: Gwendolyn Carroll

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**4:25 MJ 6050 PLC**

I, Joshua C. Morrill, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 for information associated with the cellular telephone assigned call number (872) 222-3170 (hereinafter "the subject phone"), which is stored at premises controlled by Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The information to be searched is described in the following paragraphs and in Attachment A. The requested warrant would require the Provider to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), have been employed with the FBI since February 2011, and am currently assigned to the St. Louis Division. In connection with my official FBI duties, I investigate criminal violations related to financial crime investigations. I have received specialized training in the enforcement of federal criminal laws, and I have been involved in numerous aspects of financial crime investigations. I have also received training and participated in investigations involving the interception of both wire communication and electronic communications.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (wire fraud) have been committed, are being committed, and will be committed by Raj Chauhan or other persons known and unknown.  There is also probable cause to search the location described in Attachment A for the information described in Attachment B for evidence of these crimes.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO WIRELESS PROVIDERS

6.     In my training and experience, I have learned that the Provider is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site

2

data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

7.      Based on my training and experience, I know that wireless providers can collect cell-site data about the subject phone.  I also know that wireless providers such as typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

8.      Based on my training and experience, I know that Verizon also collects per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

9.      Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the subject phone's user or users and may assist in the identification of co-conspirators and/or victims.

3

10. Because the cellular device generally attempts to communicate with the closest unobstructed tower, by reviewing the above-described information, your affiant and other law enforcement officers can determine the approximate geographic area from which the communication originated or was received.

11. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

12. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service used, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the

4

services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

## PROBABLE CAUSE

13.    On September 17, 2024, information was received from a precious metal and coin dealership located in the St. Louis area regarding a customer (herein referred to as "victim BK") whom the dealership believed was in process of being victimized through a scam. The precious metal and coin dealership reached this belief when victim BK contacted the dealership and emphasized the need for an urgent purchase of gold in the approximate amount of $197,000.

14.    On the same day, Agents met with and interviewed victim BK. During the interview, Agents learned that victim BK had recently received an email allegedly from Paypal which indicated victim BK had been charged approximately $500 to her Paypal account. The email included a telephone number to call if the charge was unwanted. Victim BK called the provided number and began a conversation with "Steven Williams," an individual who represented himself to be an employee of Paypal. According to victim BK, Williams had a foreign accent. Williams convinced victim BK to download a remote access software application on her personal computer. Williams also purported to walk victim BK through a refund request on her Paypal account; however, during the process, the purported refund request was entered as a much higher dollar amount. Williams told victim BK this was a big mistake and that she would need to buy gold to refund the extra money that was sent to her in error. Further, Williams informed victim BK that

5

her financial accounts may have also been compromised. Williams indicated he could connect victim BK with a worker in the fraud department of her financial institution.

15.    Victim BK explained earlier that day on September 17, 2024, Williams introduced victim BK to "Josh" who purported to be with the fraud department at U.S. Bank. Josh also had a foreign accent. Josh provided information to victim BK on how to make the wire transfer to purchase the gold. Victim BK was also instructed that she should not log into her U.S. Bank account online for the next three to five days due to fraud precautions.

16.    Investigators recognized the fact pattern provided by victim BK to be part of a multi-layered tech support, financial institution, and government imposter scam which typically originated from an overseas call center. Investigators also knew, based on training and experience, that the next step in the scam would be to physically send a courier to a pre-arraigned location to pick up the gold from victim BK.

17.    Victim BK agreed to participate in a controlled delivery of sham gold to the anticipated courier. At the direction of the FBI, and during the morning of September 18, 2024, victim BK advised Williams she was in possession of the gold. As anticipated, Williams informed victim BK that an individual would be dispatched to come to her home that day to pick up the package. Based on this information, the FBI set up surveillance on the home of victim BK with the intent of completing a controlled delivery of the sham gold followed by a traffic stop of the courier. Throughout the day, victim BK stayed in communication with Williams. Williams provided regular updates on the progress of the courier's travel. Williams also informed victim BK the courier would be driving a black Lincoln SUV. Williams instructed victim BK to only give the package if the courier provided the name "Jack" and the secret word of "chocolate."

6

18.     At approximately 1:50 PM central, a black Lincoln Corsair bearing Illinois license plate 7872LY being driven by an Indian male arrived at the home of victim BK. Simultaneous to the arrival of the black Lincoln SUV, Williams informed victim BK the courier had arrived at her home. Sometime shortly thereafter, victim BK departed her residence, approached the SUV, and handed off the sham gold package to the Indian male. Prior to giving the sham gold package to the courier, the courier provided the name "Jack" and the passcode of "chocolate."

19.     After receiving the package, the Indian male departed the residence in the black Lincoln SUV. The FBI surveillance team followed the black Lincoln SUV to a nearby Walgreens parking lot. The black Lincoln SUV parked in the parking lot of the Walgreens, where a member of the FBI surveillance team observed the Indian male open the controlled package of sham gold.

20.     Shortly after opening the sham gold package, the Indian male departed the Walgreens parking lot in the black Lincoln SUV and began driving on a highway.  Shortly after the black Lincoln Corsair began driving on the highway, the SUV pulled over onto the shoulder of the highway and stopped. The FBI surveillance team observed items flying out the passenger side window of the black Lincoln SUV and landing in the area by the roadside. As soon as the SUV departed, Agents recovered the contents thrown out the window. The items thrown out the window were identified as the contents of the sham gold package.

21.     A short time later, Agents conducted a vehicle traffic stop of the black Lincoln SUV on the side of the highway. At the time of the vehicle traffic stop, the Indian male driver of the black Lincoln SUV was temporarily detained. During a high-risk search of the vehicle, Agents located an iPhone 15 Pro Max and a Samsung Galaxy Z Flip 5.

22.     The Indian male driver of the black Lincoln SUV was informed he should only answer the logistical and biographical questions at this time. The driver identified himself as Raj

7

Chauhan. Despite the warning, Chauhan made the spontaneous statement that he had thrown the package out the window at the direction of another person whom he had been on the phone with.

23. After being transferred to a safer location, the handcuffs were removed from Chauhan and Chauhan was advised he was not under arrest. Prior to asking any questions and out of an abundance of caution, Chauhan was provided with his Miranda rights as memorialized on an FD-395. Chauhan was allowed ample time to read and review the form and to ask any questions. After reading and reviewing his rights, Chauhan told Agents he understood and was willing to waive his rights and make a statement to the Agents. Chauhan documented his consent by signing the FD-395. Chauhan was then interviewed by Agents and provided the following information.

A. Chauhan confirmed the cellular telephones located in the black Lincoln SUV belonged to him and agreed to provide written consent to allow investigators to image and review the contents of the cellular telephones. The Samsung Galaxy Z Flip 5 was connected to telephone number 872-222-3170 and was connected to a WhatsApp account which he used to talk to people in India. The iPhone 15 Max Pro was connected to telephone number 332-201-2953. Chauhan documented his consent to search the phones and provided the PIN numbers for both phones on an FD-26, Consent to Search form.

B. In summary, when asked about why he had come to the house today to picked up the package, Chauhan told Agents he ran a taxi business. Chauhan had been contacted on WhatsApp on the Samsung Galaxy Z Flip 5 by an individual named Ankur Desai within the past 30 to 40 days regarding his taxi business. Prior to this contact, Chauhan stated he did not know Desai. Chauhan told Agents he did not know any further details about Desai. Approximately two to three days ago, Chauhan received a message from Desai with a ZIP code near the house Chauhan went to today. Desai asked Chauhan

8

if he would drive to the ZIP code to pick up Desai's grandmother and take her to the Chicago O'Hare International Airport (ORD) for $800, to which Chauhan agreed. At approximately 8:00 AM that morning on September 18, 2024, Chauhan received a message from Desai that he (Chauhan) needed to leave as soon as possible to pick up Desai's grandmother. Chauhan and Desai spoke and exchanged messages on WhatsApp on the Samsung Galaxy Z Flip 5 throughout the drive. During the conversations, Desai and Chauhan spoke Gujurati, an Indo-Aryan language native to the Indian state of Gujarat.

C.      When Chauhan initially arrived at the residence, he was expecting for an elderly Indian woman to come outside. This was because he believed he was picking up Desai's grandmother and transporting her to ORD. Chauhan was confused when the female at the residence was Caucasian.

D.      After Chauhan arrived at the residence, a white, elderly female came outside and gave Chauhan a bag. Chauhan was told by Desai to leave the residence with the bag and drive away. Once down the road, Chauhan was instructed by Desai to pull into the Walgreens parking lot. Once parked in the parking lot, Chauhan was instructed by Desai to place his phone on record and record a video of himself opening the box. Chauhan began recording and placed his phone in the sun visor in a way the phone would record the box while it was opened. After opening the box, Chauhan told Desai the box had small black weights inside and sent the video to Desai. Desai told Chauhan he could throw the box and contents out the window and drive back home. Chauhan asked about his pay and Desai told Chauhan he would still be paid. Chauhan left the parking lot and threw the box out the window.

9

E.      Prior to being pulled over by law enforcement, Desai told Chauhan to delete all their WhatsApp messages, which Chauhan did. Chauhan did not have an explanation on why he was asked to do this nor why he followed through and did it.

F.      Throughout the course of the interview, Chauhan was asked numerous times by investigators if he had picked up packages on other occasions. Chauhan consistently stated he had never been hired to pick up a package prior to this instance. It was normal for Chauhan to travel to pick up people. The first package ever picked up by Chauhan was today.

G.      After giving Chauhan the opportunity to explain what had occurred, Agents noted that Chauhan had excluded from his statement the detail of using a fake name and code word when picking up the package. When confronted with this information, Chauhan stated that he had received messages in WhatsApp from Desai directing him to say the name "Jack" and provide the password "chocolate." When Chauhan exited the vehicle and met with the elderly female, Desai told him over the voice call on WhatsApp to say "Jack" and "chocolate."

H.      Agents also questioned Chauhan on why Desai – someone purported to be a stranger – would have trusted Chauhan to open a box that was believed to have nearly $200,000 in gold inside. Chauhan stated that he did not know why Desai would trust him to do this. Chauhan explained that based on the last name, Desai may have known someone in or known of Chauhan's family back in India. This may have given Desai confidence in trusting Chauhan. Chauhan was unable to explain this reason any further.

24.     Following the conclusion of the interview and based on the evidence available to investigators at the time, Chauhan was not placed under arrest and was allowed to leave.

25.    Agents were unable to obtain a useful extraction from the iPhone 15 Max Pro connected to telephone number 332-201-2953 but were able to obtain a successful extraction from the Samsung Galaxy Z Flip 5 connected to telephone number 872-222-3170. A review of the Samsung Galaxy Z Flip 5 revealed the following details relevant to the captioned investigation:

A.    A message threat was observed in WhatsApp with an individual named "Ankur Desai" using WhatsApp User Id 12028511211@s.whatsapp.net. The first WhatsApp message with Desai saved on the phone was on September 14, 2024. Between September 14, 2024, and September 18, 2024, numerous messages and voice calls were made between Desai and Chauhan; however, none of the content of the messages was saved on the phone. This observation would be consistent with Chauhan's statement that he deleted all the messages.

B.    Investigators also located a WhatsApp message thread with an individual named "Y M C M B 💰" using WhatsApp User Id 919727682465@s.whatsapp.net. The first WhatsApp message with Y M C M B saved on the phone was on September 16, 2024. On September 17, 2024, the following screen shot was sent from Y M C M B to Chauhan. The screen shot purported to capture a conversation between Y M C M B and an individual with a WhatsApp name of Ankur Desai. The profile picture of the Desai in the screen shot matched the profile picture of the individual with the same name whom Chauhan had also exchanged WhatsApp messages with.

11



C.     An FBI interpreter translated the phrase at the bottom of the message from Gujarati to English as, "Give this at a rate of 4 so [we] know how to write the accounts in a book."

D.     Based on past investigations dealing with gold bar scams, investigators believe the references to names, dates, and ounces in this message indicate the weight of gold previously defrauded from victims of a gold scam on certain dates by certain

12

individuals. Specifically, the message would indicate an individual named "raj" worked with an individual named "Jack" on September 5, 2024, and September 9, 2024, to execute part of the gold scam. The message also indicated a second individual by the name "monarch" also worked with an individual named Jack on September 5, 2024, and September 12, 2024, to execute part of the gold scam.

E.     Also identified in the same WhatsApp thread between Y M C M B and Chauhan was a message received by Chauhan from Y M C M B on September 18, 2024, at around 12:21 PM central (approximately 30 minutes before the controlled gold pickup). The message contained a screen shot of an picture from a social media account tagged with an individual named Monarch Sachdev.

F.     Investigators also located a three-way WhatsApp telephone call between Desai, Chauhan, and an individual named "Monarch Bhai Surti Khaman U.S.A 2" using WhatsApp User Id 13312669984@s.whatsapp.net. The call was initiated by Chauhan at 2:25 PM central – around three minutes before the car stop of Chauhan – and lasted for six minutes and 16 seconds. At the time of the traffic stop, an FBI agent involved in the traffic stop observed that one of the phones had been connected to an ongoing call, which was terminated by the Agent.

G.     Further analysis of Chauhan's phone revealed numerous text messages and phone calls between Chauhan and  Monarch Bhai Surti Khaman U.S.A 2 on September 5, 2024. This was the same day noted in the message from Y M C M B that "raj" and "monarch" were involved in what investigators believe were gold pickups for 59 ounces and 28 ounces, respectively.

13

H.      In the same WhatsApp thread between Y M C M B and Chauhan, Chauhan received a message from Y M C M B on September 18, 2024 (the day of the controlled sham gold pickup in Missouri), at around 11:47 AM central containing the contact card for Tushar Rabari with WhatsApp User Id 918511224348@s.whatsapp.net. Within 30 seconds of receiving the contact card, Chauhan initiated a one minute and 14 second WhatsApp call with Rabari. Approximately 10 minutes later, a second WhatsApp call was initiated by Rabari to Chauhan which lasted for one minute and 11 seconds.

I.      Investigators located three videos on the cellular telephone which depicted Chauhan opening the sham gold package, consistent with Chauhan's statement that he had video recorded himself opening the package.

J.      Investigators also located a photograph taken at 2:27 PM central, approximately one minute prior to the vehicle stop executed by the FBI. The photograph depicted an FBI vehicle which had pulled to the side of the road in preparation of the car stop.

26.      When investigators interviewed Chauhan following the vehicle stop, Chauhan made no mention of Y M C M B, Rabari, or Sachdev. Further, Chauhan made no reference to package pickups on September 5, 2024, or September 9, 2024. In contrast, Chauhan repeatedly told investigators he had only worked with Desai related to the trip that day to transport Desai's grandmother, and had never traveled to pick up a package before today.

**PURPOSE OF CELL-SITE LOCATION INFORMATION**

27.      Investigators believe cell-site location information from the subject phone will provide corroborative evidence of whether Raj Chauhan had, in fact, participated in additional gold pickups on September 5, 2024, or September 9, 2024. Not only will this information provide

14

evidence of further crimes, but it will show Chauhan intentionally lied to investigators about the circumstances of the package pickup on September 18, 2024, to cover up his ongoing participation in the fraud scheme. Records are sought for 14 days prior to the first suspected gold pickup through the day of the controlled sham gold delivery, or from August 22, 2024 through September 18, 2024.

## AUTHORIZATION REQUEST
## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

28.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.  The United States will execute this warrant by serving the warrant on the Provider.  Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

29.    I further request that the Court direct the Provider to disclose to the United States any information described in Section I of Attachment B that is within its possession, custody, or control.

## CONCLUSION

30.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets

15

an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

I state under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

JOSHUA MORRILL Digitally signed by JOSHUA MORRILL
Date: 2025.03.12 10:27:44 -05'00'

Joshua C. Morrill
Special Agent
Federal Bureau of Investigation


Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this __12th__ day of March, 2025

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

## 4:25 MJ 6050 PLC

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (872) 222-3170 ("the Account"), that are stored at premises controlled by Verizon Wireless ("the Provider"), headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921 .

**Attachment B**

**4:25 MJ 6050 PLC**

**Particular Things to be Seized**

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period August 22, 2024, through September 18, 2024:

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

       viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

    iii.  Data records include all date connections between the device and the network via the subject cellular telephone.

**The Provider is hereby ordered to disclose the above information to the government within 14 days of the date of this warrant.**

**II.       Information to be Seized by the United States**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud) involving Raj Chauhan and others known and unknown during the period August 22, 2024, through September 18, 2024.

3